1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSHUA J.,[1]<br><br>                                          Plaintiff,<br><br>v.<br><br>FRANK BISIGNANO, Commissioner of<br>Social Security,[2]<br><br>                                          Defendant. | Case No.:  24cv1978-LR<br><br>**ORDER REGARDING JOINT<br>MOTION FOR JUDICIAL<br>REVIEW**<br><br>**[ECF No. 17]** |

On October 24, 2024, Joshua J. ("Plaintiff") filed a complaint pursuant to 42 U.S.C. § 405(g) seeking judicial review of a decision by the Commissioner of Social Security ("Defendant") denying Plaintiff's application for social security disability benefits.  (ECF No. 1.)  Now pending before the Court is the parties' "Joint Motion for Judicial Review of Final Decision of the Commissioner of Social Security" seeking

---

[1] In the interest of privacy, this order uses only the first name and initial of the last name of the non-government party or parties in this case.  See S.D. Cal. Civ. R. 7.1(e)(6)(b).

[2] Plaintiff named Martin O'Malley, who was the Commissioner of Social Security when Plaintiff filed his complaint on October 24, 2024, as a Defendant in this action.  (See ECF No. 1 at 1.)  Frank Bisignano is now the Commissioner of the Social Security Administration, and he is automatically substituted as a party pursuant to Federal Rule of Civil Procedure 25(d).

judicial review of the denial of benefits.  (ECF No. 17.)  For the reasons discussed below, the final decision of the Commissioner is **AFFIRMED**.

# I.      PROCEDURAL BACKGROUND

On May 2, 2019, Plaintiff filed an application for a period of disability and disability insurance benefits under Title II[3] of the Social Security Act, alleging disability beginning on July 22, 2016.  (See ECF No. 11 ("AR")[4] at 341.)  After his application was denied initially and upon reconsideration, Plaintiff requested an administrative hearing before an administrative law judge ("ALJ").  (Id. at 161–62.)  An administrative hearing was held on December 15, 2020.  (Id. at 145.)  On February 3, 2021, the ALJ issued a written decision finding that Plaintiff had not been under a disability, as defined in the Social Security Act, from July 22, 2016, through September 30, 2022, the date last insured.  (Id. at 126–37.)  On March 7, 2022, the Appeals Council remanded the decision to the ALJ, citing technical difficulties with the recording of the December 15, 2020 hearing.  (Id. at 145.)  On July 14, 2023, a second administrative hearing was held.  (Id. at 41–90.)  Plaintiff appeared at the hearing with counsel, and testimony was taken from him and a vocational expert.  (Id.)

On May 20, 2024, the ALJ issued a second written decision finding that Plaintiff had not been under a disability, as defined in the Social Security Act, from July 22, 2016, through September 30, 2022, the date last insured.  (Id. at 17–33.)  The ALJ's decision

---

[3] The Court notes that the records contain Plaintiff's statement that he applied for disability insurance benefits "under Title II and Part A of Title XVIII of the Social Security Act."  (ECF No. 11 at 341.)  Part A of Title XIII of the Social Security Act is commonly referred to as the "Medicare Act" and "provides insurance for the cost of hospital and related prehospital claims."  Heckler v. Ringer, 466 U.S. 602, 605 (1984).  The Complaint, the Joint Motion, and the ALJ's decision are all concerned solely with Plaintiff's application under Title II of the Social Security Act.  (See ECF No. 1 at 1; ECF No. 11 at 17; ECF No. 17 at 2.)  The Court therefore limits its discussion to the disputed issue, which is Plaintiff's application under Title II of the Social Security Act.

[4] "AR" refers to the Administrative Record filed on December 20, 2024.  (ECF Nos. 11, 12.)  The Court's citations to the AR in this Order are to the pages listed on the original document rather than the page numbers designated by the Court's Case Management/Electronic Case Filing System ("CM/ECF"). For all other documents, the Court's citations are to the page numbers affixed by CM/ECF.

became the final decision of the Commissioner on June 25, 2024, when the Appeals Council denied Plaintiff's request for review.  (Id. at 1–3.)  This timely civil action followed.  (See ECF No. 1.)

## II.    SUMMARY OF THE ALJ'S FINDINGS

The ALJ followed the Commissioner's five-step sequential evaluation process. See 20 C.F.R. § 404.1520.  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of July 22, 2016, through his date last insured of September 30, 2022.  (AR at 20.)  At step two, the ALJ found that Plaintiff had the following severe impairments: degenerative disc and joint disease of the back, shoulders, and neck; seizure disorder; migraine headaches; dyslexic learning disorder; and obesity.  (See id.)  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Commissioner's Listing of Impairments.  (See id. at 23.)  Next, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to do the following:

> [P]erform light work, as defined in 20 CFR 404.1567(b), with the following exceptions: occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolding; occasionally balance, stoop, kneel, crouch, or crawl; frequently reach in all directions, bilaterally; frequently push or pull with upper extremities and only occasionally push or pull with lower extremities.  The claimant needs to avoid any work at unprotected heights, adjacent to dangerous moving machinery, open bodies of water, or open flame.  He cannot have a job that requires driving a motor vehicle.  He needs to avoid any concentrated exposure to loud noise, flashing lights, extreme hot or extreme cold temperatures, dust, odors, fumes, or gases.  He requires a work area background noise environment no greater than moderate noise.  He is limited to work involving simple, routine tasks.

(Id. at 24.)

At step four, the ALJ determined that Plaintiff was unable to perform his past relevant work as a commercial cleaner, sheet metal worker, and automobile mechanic. (Id. at 32.)  At step five, based on the VE's testimony, the ALJ determined that a

hypothetical person with Plaintiff's vocational profile and RFC could perform the requirements of occupations that existed in significant numbers in the national economy, such as cashier II, marker, and assembler.  (See id. at 32–33.)  The ALJ then found that Plaintiff was not disabled from July 22, 2016, the alleged onset date, through September 30, 2022, the date last insured.  (Id. at 33.)

### III.    DISPUTED ISSUES

As reflected in the parties' Joint Motion, Plaintiff raises two issues as grounds for reversal and remand: (1) whether the ALJ supported Plaintiff's RFC with substantial evidence; and (2) whether the ALJ properly rejected Plaintiff's subjective symptom testimony.  (See ECF No. 17 at 6.)

### IV.    STANDARD OF REVIEW

Section 405(g) of the Social Security Act allows unsuccessful applicants to seek judicial review of the Commissioner's final decision.  42 U.S.C. § 405(g).  The scope of judicial review is limited, and the denial of benefits will not be disturbed if it is supported by substantial evidence in the record and contains no legal error.  See id.; Buck v. Berryhill, 869 F.3d 1040, 1048 (9th Cir. 2017).  "Substantial evidence means more than a mere scintilla, but less than a preponderance.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Revels v. Berryhill, 874 F.3d 648, 654 (9th Cir. 2017) (quoting Desrosiers v. Sec'y of Health & Hum. Servs., 846 F.2d 573, 576 (9th Cir. 1988)).  In determining whether the Commissioner's decision is supported by substantial evidence, a reviewing court "must assess the entire record, weighing the evidence both supporting and detracting from the agency's conclusion," and "may not reweigh the evidence or substitute [its] judgment for that of the ALJ."  Ahearn v. Saul, 988 F.3d 1111, 1115 (9th Cir. 2021).  Where the evidence can be interpreted in more than one way, the court must uphold the ALJ's decision.  Id. at 1115–16; Attmore v. Colvin, 827 F.3d 872, 875 (9th Cir. 2016).  The court may consider "only the reasons provided by the ALJ in the disability determination and may not affirm the

ALJ on a ground upon which [he or she] did not rely." Revels, 874 F.3d at 654 (internal quotation omitted).

## V.    RELEVANT MEDICAL BACKGROUND

### A.    Onset of Alleged Disability

On July 22, 2016, Plaintiff visited the San Diego Medical Center ("SDMC") after experiencing back pain. (See AR at 930.) Joshua Snodgrass, M.D., a primary care provider, diagnosed Plaintiff with "herniation of lumbar intervertebral disc [with] radiculopathy" and chronic back pain. (Id. at 932.) Dr. Snodgrass prescribed Plaintiff Meloxicam[5] and suggested completing physical therapy. (Id.)

Plaintiff again visited the SDMC on August 12, 2016, and "had a seizure in the waiting room." (Id. at 911.) Plaintiff's wife reported to hospital staff that for "at least a year now, [Plaintiff] has had 'episodes' where he would have a 'metallic taste' in his mouth, then [proceed] to feel lightheaded and [have] palpitations." (Id.) The triage nurse recorded witnessing Plaintiff having a "generalized tonic clonic seizure."[6] (Id.)

/ / /

---

[5] "Meloxicam is a nonsteroidal anti-inflammatory drug (NSAID) used to relieve pain and swelling." Villasenor v. Kijakazi, Case No. 1:21-cv-00548-SKO, 2022 WL 18027854, at *1 n.4 (E.D. Cal. Dec. 30, 2022); see also Terrazas v. Astrue, No. 1:10-cv-00113-SMS, 2011 WL 1239814, at *3 n.4 (E.D. Cal. Mar. 29, 2011) ("Mobic (meloxicam) is a nonsteroidal anti-inflammatory drug used to relieve the pain, tenderness, swelling, and stiffness of arthritis.").

[6] The hearing transcript demonstrates that Plaintiff referred to this seizure as a "granny seizure." (See AR at 56.) The hearing transcript also indicates the ALJ referred to this seizure as a "grand seizure." (See id. at 64.) Plaintiff's medical records refer to this seizure as a "tonic-clonic" seizure. (See id. at 3032, 3696, 3762, 3827, 3857). Generalized tonic-clonic seizures can also be referred to as "grand mal" seizures. See Quiroz v. Kijakazi, No. 1:22-cv-01215-GSA, 2023 WL 7305263, at *9 (E.D. Cal. Nov. 6, 2023) (noting that the terms "grand mal" and "tonic-clonic" describe the same kind of seizure); Peters v. Colvin, No. CV 13-8907-JPR, 2015 WL 349421, at *6 n.8 (C.D. Cal. Jan. 23, 2015) (same); Kestner v. Colvin, No. C 13-04747 LB, 2014 WL 5517787, at *3 n.7 (N.D. Cal. Oct. 31, 2014) (same). Accordingly, the Court interprets Plaintiff's references to a "granny seizure," the ALJ's reference to a "grand" seizure, and references in the medical record referring to a "tonic-clonic" seizure, as references to the same event, and attributes any discrepancy in terminology to pronunciation or transcription differences. In the interest of clarity and consistency, the Court will use the term "tonic-clonic" throughout this Order.

**B.    Degenerative Disc and Joint Disease of the Back, Shoulders, and Neck**

Following Plaintiff's August 12, 2016 seizure, Plaintiff underwent radiofrequency ablation therapy, also described as "injection therapy" or "RFT."[7]  (Id. at 569, 576, 703, 736, 1477, 1828, 2161, 3041.)  On May 30, 2018, William Frase Luetzow, MD, an orthopedic surgeon, performed an arthroscopy of Plaintiff's left shoulder.  (Id. at 567–68.)  Plaintiff later described this arthroscopy as improving his shoulder and neck pain.  (Id.)  Derek Daniel Kwan, MD, a pain management specialist, described Plaintiff's RFT as having been "quite helpful" up until "just recently" in progress notes from a July 31, 2020 RFT administration.  (Id. at 1842.)  On September 16, 2020, Plaintiff reported experiencing chronic neck pain and increased radiating arm symptoms.  (Id. at 1947.)

**C.    Seizure Disorder**

Plaintiff reported that his seizures started in August 2016, after his back injury, occurred randomly, and produced loss of consciousness, convulsions, changes in facial expression, and blank staring.  (Id. at 463.)  On November 27, Elizaeth Schlosser Covell, MD, a neurologist, diagnosed Plaintiff with epilepsy and prescribed Keppra.[8]  (Id. at 706.)  Plaintiff stated that his seizure medications "caus[ed] him to feel sedated and have cognitive impairment."  (Id. at 3032.)  Plaintiff reported experiencing seizures at least weekly, peaking with sixteen seizures in April 2019.  (Id. at 482.)  Plaintiff reported that after each seizure, he was severely fatigued and had no energy.  (Id. at 487.)

---

[7] Radiofrequency ablation "is a procedure whereby an electrical current produced by a radio wave is used to heat up a small area of nerve tissue, thereby decreasing pain signals from that specific area." Squier v. Berryhill, Civil No.: 6:15-cv-01243-JE, 2017 WL 1250995, at *4 n.2 (D. Or. Mar. 24, 2017); see also Turner v. Berryhill, Case No. 2:16-cv-02932-APG-GWF, 2019 WL 5680401, at *9 n.3 (D. Nev. July 29, 2019) ("[R]adiofrequency ablation is a procedure that uses radio waves to stop the [relevant] nerve from transmitting pain signals from the injured [area] to the brain.").

[8] "Keppra is the brand name for [L]evetiracetam, an anticonvulsant that treats seizures 'by decreasing abnormal excitement in the brain.'" Peters, 2015 WL 349421, at *4 n.4; see also Arellano v. Santos, Case No.: 3:18-cv-02391-BTM-WVG, 2020 WL 1275650, at *4 n.2 (S.D. Cal. Mar. 16, 2020) (internal quotations omitted) (describing Keppra as "an oral and intravenous pyrrolidine derivative antiepileptic drug used for the treatment of certain types of partial, myoclonic, and generalized tonic-clonic seizures").

**D.    Migraine Headaches and Auras**

On December 23, 2016, Plaintiff reported to Bang Xuan Trinh, MD, a family medicine practitioner, that "he [had] been getting debilitating headaches." (Id. at 805.) Dr. Trinh identified these "headaches" as auras, which consisted "of metallic taste, dizziness, lightheadedness that last[ed] for up to 5 minutes" and caused Plaintiff to feel "drained afterwards." (Id.) Dr. Trinh noted that Topiramate[9] reduced the frequency of Plaintiff's auras from seven-to-eight times per month to two-to-three times per month. (Id.) On November 27, 2017, Dr. Schlosser Covell discontinued Plaintiff's Topiramate prescription due to side effects, substituting Keppra. (Id. at 706.) On January 9, 2018, Darleen Fardan, RN, recorded that Plaintiff complained of "worsening headache," following cessation of Topiramate and reported experiencing migraine headaches about four out of every five days. (Id. at 694.) Plaintiff stated that his migraines typically lasted over a day and were severe, often with lighter headaches in between. (Id. at 1769.)

**E.    Plaintiff's April 9, 2018 Psychological Evaluation**

On April 9, 2018, Charlie Morgan, Ph.D., a clinical psychologist, conducted a neuropsychological evaluation of Plaintiff. (Id. at 671–74.) Plaintiff reported increased difficulties with memory, spelling, understanding, writing, multitasking, and mental calculations. (Id. at 671–72.) Plaintiff reported childhood diagnoses of Dyslexia and ADHD. (Id. at 672.) Dr. Morgan found that Plaintiff's degree of psychological disturbance was mild or appropriate to Plaintiff's physical condition. (Id. at 671.) Dr. Morgan further found that Plaintiff's test results "demonstrated overall intellectual functioning in the low average range." (Id. at 672.) Dr. Morgan described Plaintiff's

---

[9] "Topiramate 'is an anticonvulsant prescribed to treat seizures and migraine headaches.'" Medley v. Allison, Case No. 5:21-CV-00937-DOC (MAR), 2023 WL 9800488, at *7 n.15 (C.D. Cal. Dec. 26, 2023) (quoting Bitler v. Saul, No. 1:18-CV-01062-GSA, 2020 WL 916869, at *2 n.8 (E.D. Cal. Feb. 26, 2020)).

verbal comprehension and processing speed as "low average," his working memory as "borderline," and his perceptual reasoning as "average." (Id.)

Dr. Morgan found that Plaintiff's "[b]orderline to low average scores on measures of intellectual functioning for [Plaintiff] may be consistent with lifelong levels of functioning given history of dyslexia and special education classes." (Id.) Moreover, he determined that "[i]t is unlikely that the single seizure this [Plaintiff] experienced has contributed [significantly] to any cognitive difficulties." (Id.) Dr. Morgan further opined that potential "causes of [Plaintiff's] subjective cognitive difficulties may include ongoing depression symptoms and medication side effects of [G]abapentin,[10] [P]ropranolol,[11] and [L]evetiracetam." (Id. at 674.)

## F.    Subsequent Psychological Evaluations and Treatment

On August 1, 2018, Shetal M. Patel, Ph.D., a clinical psychologist, assessed Plaintiff. (Id. at 633.) Dr. Patel noted that Plaintiff appeared to have overall limited functioning, which Dr. Patel attributed to Plaintiff's poor ability to cope with chronic pain, psychosocial stressors, sleep disturbances, depressive symptoms, and functional limitations. (Id. at 634.) Dr. Patel reported that Plaintiff's "impulse" and "judgement" were unimpaired, but his mood was depressed. (Id.)

During a consultation on May 22, 2019, Brian Tobe, M.D., a psychiatrist, documented Plaintiff's report of "cognitive changes including difficulties with math and

---

[10] "Gabapentin is 'a non-narcotic neuropathic medication used to treat epilepsy and chronic pain.'" Matthew C. v. Comm'r of Soc. Sec., Case No.: 24cv322-JES (LR), 2025 WL 572891, at *3 n.10 (S.D. Cal. Feb. 21, 2025) (quoting Arreguin v. Chin, No. CV 11-07252 JFW (AJW), 2012 WL 7018236, at *1 n.2 (C.D. Cal. Dec. 3, 2012)); see also Carr v. Colvin, No. EDCV 13-1046-JPR, 2014 WL 7149527, at *3 n.4 (C.D. Cal. Dec. 15, 2014) ("Gabapentin is used to help control certain types of seizures in people who have epilepsy.").

[11] "Propranolol is a beta blocker used to treat high blood pressure, irregular heartbeats, as well as shaking (tremors), and it also is used to prevent headaches/migraines and chest pain (angina)." Phillippi v. Kelso, Case No. 15-cv-05579-DMR (PR), 2017 WL 3314934, at *7 n.8 (N.D. Cal. Aug. 3, 2017); see also Resnik v. Kijakazi, Case No.: 22-CV-1715-SBC, 2024 WL 1219012, at *2 (S.D. Cal. Jan. 25, 2024) (noting that a claimant took Propranolol to manage hand tremors).

incr[e]ased dyslexia." (Id. at 1233.)  Dr. Tobe's mental status examination revealed that Plaintiff's thought process was "coherent, logical, [and] relevant," and his memory and cognition were intact.  (Id. at 1234.)  Dr. Tobe advised Plaintiff of possible "side effects including . . . possible increased seizure activity," if Plaintiff used medication to treat his mental health conditions.  (Id. at 1236.)

## VI.    DISCUSSION

### A.    The ALJ's RFC Determination

#### 1.    Parties' arguments

Plaintiff argues that the ALJ erred by including mental health limitations in Plaintiff's RFC that were not supported by substantial medical evidence.  (ECF No. 17 at 7.)  Specifically, Plaintiff contends that the ALJ's inclusion of a limitation to "simple, routine tasks" constituted legal error because it lacked the support of a physician's opinion.  (Id. at 8.)  Plaintiff alleges that, in the absence of such an opinion, the limitation represents the ALJ's impermissible interpretation of medical evidence.  (Id. at 13.)  Plaintiff therefore asserts that the ALJ committed harmful error warranting remand by failing to "articulate a logical bridge" from the evidence in the record to his conclusions.  (Id. at 11.)

Defendant argues that the ALJ did not err in formulating Plaintiff's RFC, and that the inclusion of a limitation to simple routine tasks reflects the ALJ's permissible consideration of the record as a whole.  (Id. at 15.)  Defendant maintains that the ALJ's determination does not have to be identical to any particular medical record.  (Id. at 16 (citing Ford v. Saul, 950 F.3d 1141, 1153–564 (9th Cir. 2020)).)  Defendant further argues that substantial evidence in the record supported the ALJ's RFC finding regarding Plaintiff's mental limitations.  (ECF No. 17 at 17.)

#### 2.    Applicable law

An RFC is an assessment of the sustained, work-related physical and mental activities the claimant can still do on a regular and continuing basis despite his or her limitations.  20 C.F.R. §§ 404.1520(e), 404.1545(a); see also Valencia v. Heckler, 751

F.2d 1082, 1085 (9th Cir. 1985) (noting that the RFC reflects current "physical and mental capabilities"); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (July 2, 1996).  Thus, it represents the maximum amount of work the claimant is able to perform based on all the relevant evidence in the record.  See id.; see also 20 C.F.R. § 404.1545(a)(3) (explaining that an RFC determination must be "based on all of the relevant medical and other evidence").

The RFC is not a medical opinion, but a legal decision that is expressly reserved for the Commissioner.  See 20 C.F.R. §§ 404.1527(d)(2), 404.1546(c); Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001) (citing 20 C.F.R. § 404.1545) ("It is clear that it is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity.").  Where "the record contains conflicting medical evidence, the ALJ is charged with determining credibility and resolving the conflict."  Benton v. Barnhart, 331 F.3d 1030, 1040 (9th Cir. 2003); see also Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) ("the ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence."); Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 603 (9th Cir. 1999) (holding that the ALJ was "responsible for resolving conflicts" and "internal inconsistencies" within doctor's reports).

The ALJ must include all of a claimant's impairments in the RFC assessment.  20 C.F.R. § 404.1545; see also Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1228 (9th Cir. 2009).  Because the assessment of a claimant's RFC is essential to steps four and five of the sequential analysis in determining whether a claimant can still work despite severe medical impairments, an improper evaluation of the claimant's ability to perform specific work-related functions "could make the difference between a finding of 'disabled' and 'not disabled.'"  SSR 96-8p, 1996 WL 374184, at *4.  Accordingly, "an RFC that fails to take into account a claimant's limitations is defective."  Valentine v. Comm'r of Soc. Sec. Admin., 574 F.3d 685, 690 (9th Cir. 2009).  Conversely, an ALJ's "overinclusion of debilitating factors" in an RFC is harmless because it benefits the claimant.  Johnson v. Shalala, 60 F.3d 1428, 1436 n.9 (9th Cir. 1995); see also Nacoste-

Harris v. Berryhill, 711 F. App'x 378, 380 (9th Cir. 2017) (an ALJ's inclusion of additional limitations, which benefit a claimant constitutes harmless error, which does not warrant remand).  In determining whether an ALJ committed error in assessing the claimant's RFC, the relevant inquiry is whether the medical evidence supports the ALJ's finding.  See Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1173–74 (9th Cir. 2008) (holding that an RFC assessment adequately captures a claimant's restrictions if it is consistent with the concrete limitations present in the medical opinions).

### 3.    Analysis

The ALJ found that Plaintiff has the RFC "to perform light work as defined in 20 CFR 404.1567(b)," with specified exertional limitations, including that Plaintiff "is limited to work involving simple, routine tasks."  (AR at 24.)  The ALJ explained that "the combined medical and testimonial record warrants limitation to simple, routine tasks in light of [Plaintiff's] historical learning disorder."  (Id. at 31.)  The ALJ further noted that the inclusion of this limitation should "help and account for any periods of increased depressive or other [mental health] symptoms as well."  (Id.)

Plaintiff characterizes the ALJ's decision as "fail[ing] to provide any discussion of, or citation to, the medical evidence to support the limitation to simple, routine tasks" contained in Plaintiff's RFC.  (ECF No. 17 at 11.)  While the ALJ's decision must be rooted in medical evidence, the courts do not "require ALJs to draft dissertations when denying benefits."  Lambert v. Saul, 980 F.3d 1266, 1277 (9th Cir. 2020).  "ALJs need not seek the opinion of a medical expert every time they review new medical evidence and make a[n] RFC determination."  Bufkin v. Saul, 836 F. App'x 578, 579 (9th Cir. 2021).  Here, the ALJ's decision contains numerous references to medical evidence linked to Plaintiff's limitation to simple, routine tasks.

Specifically, the ALJ considered an April 9, 2018 neuropsychological examination conducted by Dr. Charlie Morgan to evaluate Plaintiff's mental functioning.  (See AR at 22 (citing id. at 671–74).)  The ALJ's assessment is consistent with Dr. Morgan's determination that Plaintiff's "borderline to low average scores on measures of

intellectual functioning might be consistent with lifelong levels of functioning given history of dyslexia and special education classes." (Id.)  The ALJ also references Dr. Morgan's observation that Plaintiff "struggled a little with immediate memory of items (usually attention-related)," but was still "able to retain information over time." (Id.)

The ALJ also referenced Plaintiff's August 2018 pain assessment with psychologist Dr. Shetal Patel, noting Dr. Patel's assessment that Plaintiff's "memory was intact to immediate, recent, and remote recall." (Id. at 22 (citing id. at 634).)  Although Plaintiff reported difficulties with concentration and memory, Dr. Patel's notes reflect that Plaintiff demonstrated "what appeared to be intact cognitive functioning." (Id. at 634.)

Additionally, the ALJ considered Plaintiff's May 22, 2019 psychiatric consultation with Dr. Brian Tobe, during which Plaintiff reported cognitive challenges, including increased difficulties with math and dyslexia. (Id. at 22 (citing id. at 1232–37).)  The ALJ summarized Dr. Tobe's findings that Plaintiff's "cognition, concentration, and focus were intact," along with "[h]is short-and long-term memory." (Id. (citing id. at 1234).)  The ALJ also noted Dr. Tobe's assessment of a depressive disorder, and the risk that treating this disorder with medication could decrease Plaintiff's seizure threshold. (Id. at 22 (citing id. at 1236).)

Although the ALJ did not explicitly state that he derived the simple work tasks limitation in Plaintiff's RFC from a specific provider's report, the ALJ is not required to provide such a clear recitation of specific terms. See Magallanes v. Bowen, 881 F.2d 747, 755 (9th Cir. 1989) (explaining that reviewing courts may draw "specific and legitimate inferences" about medical sources contained within an ALJ's explanation of a claimant's RFC); Althoff-Gromer v. Comm'r of Soc. Sec., No. 2:18-cv-00082-KJN, 2019 WL 1316710, at *13 (E.D. Cal. Mar. 22, 2019) (citing Turner v. Comm'r of Soc. Sec., 613 F.3d 1217, 1222–23 (9th Cir. 2010)) ("The ALJ's RFC determination need not precisely reflect any particular medical provider's assessment.").  Rather, Ninth Circuit precedent requires the ALJ to provide "some reasoning" such that "the agency's path"

can "reasonably be discerned." Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1103 (9th Cir. 2014).  Here, the ALJ referenced numerous psychological assessments, which yielded mixed results regarding Plaintiff's concentration and ability to carry out tasks, as the basis for including a limitation to simple, routine tasks in Plaintiff's assessed RFC.  (See AR at 31.)  These references are sufficient to demonstrate the reasoning behind the ALJ's inclusion of Plaintiff's limitation to "simple, routine tasks."  See Stubbs-Danielson, 539 F.3d at 1174 (explaining that a limitation to simple routine tasks appropriately reflects moderate limitations in "concentration, persistence, or pace where the assessment is consistent with restrictions identified in the medical testimony"); see also James H. v. Dudek, Case No. 2:24-cv-05631-GJS, 2025 WL 1202223, at *4–5 (C.D. Cal. Apr. 25, 2025) (collecting cases affirming an ALJ's inclusion of a limitation to simple routine tasks as a reflection of a moderate limitation in concentrating, persisting, or maintaining pace).

Moreover, Plaintiff has not demonstrated any harm arising from the ALJ's inclusion of a limitation to "simple, routine tasks" in Plaintiff's RFC.  See Shinseki v. Sanders, 556 U.S. 396, 409 (2009) (providing that "the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.").  Plaintiff does not identify any medical opinions in the record that are more restrictive than limitations the ALJ assessed in Plaintiff's RFC, proffering only a definition of "specific learning disorder" from the internet as evidence that the ALJ failed to sufficiently account for Plaintiff's dyslexia.  (See ECF No. 17 at 13.)  Such evidence is inapposite to the Court's review.  See Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003) (explaining that a reviewing court is "constrained to review the reasons the ALJ asserts" in his or her opinion).  There is no medical evidence in the record indicating greater limitations than those the ALJ included in Plaintiff's RFC, and Plaintiff therefore is unable to show that the ALJ's inclusion of the limitation to "simple, routine tasks" in Plaintiff's RFC was harmful error.  See Burns v. Bisignano, No. 24-4199, 2025 WL 1937448, at *2 (9th Cir. July 15, 2025) (finding harmless error, where an "RFC's

limitations align with and are even more restrictive that the limitations opined by" the doctors).  Thus, even if the ALJ committed an error, such error was inconsequential to the ultimate nondisability determination and was harmless.  See Tommasetti, 533 F.3d at 1038 (quoting Robbins v. Soc. Sec. Admin., 466 F.3d 880, 885 (9th Cir. 2006)) ("the Court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'").

### 4.    Conclusion

For the reasons set forth above, the Court finds that substantial evidence in the record supported the RFC the ALJ assessed for Plaintiff, and the ALJ did not commit harmful error.

## B.    **Plaintiff's Subjective Symptom Testimony**

### 1.    Parties' arguments

Plaintiff argues that the ALJ failed to offer specific, clear, and convincing reasons to discount his subjective symptom testimony.  (See ECF No. 17 at 26–37.)  Plaintiff asserts that the ALJ provided only "routine" and "deficient" language to discount his testimony, rather than engaging in an individualized analysis of Plaintiff's testimony. (Id. at 29.)  Plaintiff claims that in his written opinion, the ALJ failed to connect his discussion of objective medical evidence in the record and Plaintiff's daily activities to those parts of Plaintiff's testimony the ALJ found not credible, and that the ALJ's discussion was overly conclusory.  (See id. at 33–37.)  Plaintiff maintains that the ALJ's discussion of the objective medical evidence in the record is insufficient to discount Plaintiff's testimony.  (See id. at 33 (citing Treichler, 775 F.3d at 1103).)  Plaintiff also argues that the ALJ improperly concluded that Plaintiff's testimony concerning his daily activities was inconsistent with Plaintiff's testimony regarding his symptoms.  (See id. at 36 (citing Vertigan v. Halter, 260 F.3d at 1050 (9th Cir. 2001).)

Defendant responds that substantial evidence supported the ALJ's decision to discount Plaintiff's subjective symptom testimony.  (See ECF No. 17 at 37.)  In support,

1  Defendant states that the record demonstrated improvement with treatment, including

2  medication.  (See id. at 40.)  Defendant also asserts that the ALJ properly relied on

3  Plaintiff's reports of his daily activities in his function report, as well as in discussions

4  with medical providers.  (See id. at 42.)  Defendant contends that Plaintiff's daily

5  activities contradicted the limitations that Plaintiff described in his testimony.  (See id. at

6  43.)

7          **2.      Applicable law**

8          The Ninth Circuit has established a two-part test for evaluating a claimant's

9  allegations regarding subjective symptoms.  See Trevizo v. Berryhill, 871 F.3d 664, 678

10  (9th Cir. 2017); see also SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016).  First, the ALJ

11  determines whether there is "objective medical evidence of an underlying impairment

12  that could reasonably be expected to produce the pain or other symptoms alleged."

13  Trevizo, 871 F.3d at 678 (quoting Garrison v. Colvin, 759 F.3d 995, 1014–15 (9th Cir.

14  2014)).  Second, if a claimant presented such evidence, and there is no evidence of

15  malingering, the ALJ may reject the claimant's statements about the severity of the

16  claimant's symptoms "only by offering specific, clear and convincing reasons for doing

17  so."  Id.

18          When evaluating subjective symptom testimony, "[g]eneral findings are

19  insufficient."  Brown-Hunter v. Colvin, 806 F.3d 487, 493 (9th Cir. 2015).  "[A]n ALJ

20  does not provide specific, clear, and convincing reasons for rejecting a claimant's

21  testimony by simply reciting the medical evidence in support of his or her residual

22  functional capacity determination."  Id. at 489.  Instead, the ALJ must identify the

23  testimony regarding the claimant's symptoms that the ALJ finds not credible, and explain

24  what evidence undermines the claimant's testimony.  See Lambert, 980 F.3d at 1277

25  (citing Treichler, 775 F.3d at 1102); see also Bunnell v. Colvin, 775 F.3d 1133, 1139 (9th

26  Cir. 2014) (finding error where the ALJ "never connected the medical record" to the

27  claimant's testimony, and did not make "a specific finding linking a lack of medical

28  records to [the claimant's] testimony about the intensity" of her symptoms); Orteza v.

*Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (providing that the ALJ's reasons for discounting a claimant's testimony must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discount the claimant's testimony").

"Because symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone," the ALJ considers "all of the evidence presented," including information about the claimant's prior work record, statements about symptoms, evidence from medical sources, and observations by the Agency's employees and other individuals. See 20 C.F.R. § 404.1529(c)(3); SSR 16-3p, 2016 WL 1119029. In addition, the ALJ may consider other factors, such as the claimant's daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain; treatment; and any other measures used to relieve pain. See 20 C.F.R. § 404.1529(c)(3); SSR 16-3p, 2016 WL 1119029.

### 3.    Testimony during Plaintiff's July 14, 2023 hearing

Plaintiff testified that he injured his back approximately seven years prior to his June 14, 2023 hearing. (See AR at 55.) He elaborated that an MRI subsequently revealed "multiple ruptured discs pinching [his] spinal cord." (Id. at 56.) Plaintiff stated that approximately three weeks after this injury, he had a generalized tonic-clonic seizure while visiting the emergency room. (Id.) He stated that, while experiencing this seizure, he "tore [his] bicep, labrum and rotator completely apart in [his] left shoulder." (Id.) Plaintiff reported that he had a prior injury of his right shoulder, which was unrelated to this seizure. (Id. at 56–57.) Plaintiff explained that he began having seizures in 2014 or 2015, although he expressed that he was unaware of his epilepsy until 2016, and would not have recognized them as seizures until the 2016 generalized tonic-clonic seizure. (See id. at 58–60.) He further reported diagnoses of hemochromatosis,[12] severe

---

[12] "Hemochromatosis is a disorder where iron-containing pigments collect in a person's tissues, resulting joint or abdominal pain, weakness, and fatigue." Mitchell v. Metro. Life Ins. Co., 523 F. Supp. 2d 1132,

depression, and dyslexia.  (See id. at 62, 69.)  Plaintiff also testified he "had dyslexia [his] whole life, but after [his] seizures it got significantly worse."  (Id. at 69.)

Plaintiff also testified that he "had [his] complete [left] shoulder fused" following its injury during his tonic-clonic seizure.  (Id. at 56.)  He stated that his "doctors [had] been doing cortisone injections" and RFT to treat his back.  (Id. at 57.)  Plaintiff further reported undergoing surgery in both elbows in 2022, having "both [his] ulnar nerves relocated in both [his] arms," and having carpal tunnel surgery done simultaneously. (Id.)  Plaintiff claimed this surgery was only partially successful, and that he experienced occasional numbness in his index and middle fingers.  (Id. at 58.)  Plaintiff stated that he took medications including Keppra, Gabapentin, Lacosamide,[13] and Propranolol to manage his epilepsy.  (Id. at 60.)  Plaintiff said he underwent phlebotomies to manage his hemochromatosis.  (Id. at 62.)  He explained that he was unable to take medication for depression because it would interact negatively with his epilepsy medication.  (Id.) Although Plaintiff stated he had worked with a therapist in the past, he reported terminating care and said he was not receiving any mental health care at the time of the

///

///

///

///

///

---

1138 n.4 (C.D. Cal. 2007); see also Billups-Rothenberg, Inc. v. Associated Reg'l & Univ. Pathologists Inc., No. SA 08-CV-01349-MRP (SSx), 2010 WL 6649272, at *2 (C.D. Cal. May 26, 2010) ("Hemochromatosis is a disorder characterized by the excessive iron absorption by the body.  The excess iron is deposited in various organs and can lead to organ failure and other serious illnesses.").

[13] Lacosamide, marketed under the brand name "Vimpat," "is an anticonvulsant and is used in combination with other medications to control certain types of seizures."  Pederson v. Corizon Health Inc., No. CV 18-00513-TUC-JGZ, 2019 WL 13234852, at *3 n.3 (D. Ariz. Apr. 22, 2019); see also Millikan v. Comm'r of Soc. Sec., Case No. 1:17-cv-01360-SAB, 2018 WL 6202109, at *6 (E.D. Cal. Nov. 28, 2018) (describing Vimpat as a seizure medication).

hearing.  (Id. at 70.)  He reported taking Aimovig,[14] Lorazepam,[15] and Toradol[16] for his migraines.  (Id. at 63.)

Additionally, Plaintiff stated he had a driver's license, although he claimed he did not drive often and required another licensed adult in the car with him.  (Id. at 54–55.)  He testified that he vacuumed the house and took out garbage weighing less than twenty pounds, but such activities caused great fatigue.  (Id. at 70, 73.)  Plaintiff asserted he was able to walk for fifteen minutes before needing to rest due to pain and fatigue.  (Id. at 71, 73.)  Plaintiff reported building Legos with his daughter, caring for his chickens, and preparing frozen meals.  (Id. at 67–68.)  Plaintiff further explained that he did not grocery shop and had trouble getting out of bed, but he was able to shower and manage his personal hygiene.  (Id. at 74–75.)

### 4.    Function reports

Plaintiff submitted two function reports, dated May 11, 2019, and May 16, 2019.  (See id. at 430–37, 453–60.)  In these reports, Plaintiff stated that he was able to "care for [his] child when she is on break from school," and collect eggs and feed his chickens every day, with help from his wife and daughter.  (Id. at 431, 454.)  Plaintiff claimed that his disability prevented him from "work[ing] sheet metal, hunting, fishing, hiking, [and] go[ing] to the gym daily," though he also admitted that he "still fish[es] but not as often

---

[14] Aimovig is a medication which may be prescribed to manage migraine symptoms.  See, e.g., Kristine W. v. Comm'r, Soc. Sec. Admin., No. 6:22-cv-00358-HZ, 2023 WL 5665601 at *3 (D. Or. Aug. 31, 2023); John R. v. Comm'r of Soc. Sec., Case No. 20-cv-07096-JST, 2022 WL 1601411, at *2 (N.D. Cal. Feb. 28, 2022).

[15] Lorazepam is a benzodiazepine that slows activity in the brain and is commonly prescribed to relieve anxiety.  See McMillen v. Saul, No. 1:18-cv-01115-GSA, 2019 WL 6878163, at *12 n.13 (E.D. Cal. Dec. 17, 2019); Luevano v. Berryhill, Case No. ED CV 16-0380-DFM, 2017 WL 2413686, at *3 n.3 (C.D. Cal. June 2, 2017).

[16] Toradol is a nonsteroidal anti-inflammatory drug (NSAID) "used in emergencies and treatment of severe migraine attacks when other medications have not worked."  Valdez v. AT&T Umbrella Benefit Plan No. 1, 371 F. Supp. 3d 754, 760 (S.D. Cal. 2019); Ostrander v. Astrue, No. 2:08-cv-02850 KJN, 2010 WL 3783693, at *2 n.7 (E.D. Cal. Sept. 27, 2010).

as [he] would like." (Id. at 431, 434, 454, 457.)  Plaintiff described preparing his meals daily, and stated that he "c[ould] follow directions." (Id. at 432, 455.)  He elaborated that, although his dyslexia had gotten worse after his seizure, he was able to follow written instructions "well," if he knew the words and spoken instructions "very well." (Id. at 435, 458.)  Plaintiff also stated that he got along well with authority figures, and handled stress and changes in routine "very well." (Id. at 436, 459.)  Plaintiff further noted that he was able to do laundry, mow, weed, vacuum, and do the dishes. (Id. at 432, 455.)  Plaintiff reported that he went outside every day and was able to travel by walking, driving a car, or riding in a car. (Id. at 433, 456.)  He stated that he was able to walk forty-five-to-sixty minutes before needing to rest. (Id. at 435, 458.)

Plaintiff's wife submitted a third-party function report dated May 16, 2019. (Id. at 441–48.)  She also indicated that Plaintiff was able to care for himself, as well as their daughter and pet chickens. (Id. at 442.)  She stated that Plaintiff's epilepsy and migraines prevented him from hiking, biking, fishing, math, and reading. (Id.)  Additionally, she described limitations in Plaintiff's memory, understanding, and concentration, noting that Plaintiff was not able to follow written instructions well. (Id. at 446.)  Although she noted that Plaintiff was able to travel by walking, driving, or riding in a car, she also noted that he drove infrequently. (Id. at 444.)

### 5.    Analysis

The parties do not dispute the ALJ's finding that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (Id. at 28; see also ECF No. 17 at 28.)  Accordingly, the first prong of the ALJ's inquiry regarding Plaintiff's subjective symptoms is satisfied.

Turning to the second prong of the ALJ's inquiry, neither party alleges that the ALJ found that Plaintiff was malingering. (See ECF No. 17 at 6.)  The Court therefore is required to determine whether the ALJ identified which of Plaintiff's subjective allegations of impairment he discounted, and whether the ALJ provided specific, clear,

and convincing reasons for doing so.  See Brown-Hunter, 806 F.3d at 489; Lambert, 980 F.3d at 1277.

The ALJ summarized Plaintiff's testimony as follows:

The claimant reported that he stopped working because of his conditions, including refractory epilepsy, dyslexia, and injuries of the back, neck, and shoulders (Exhibits 1E, 4E, 6E, 10E, 12E; Hearing Testimony).  He testified that he was hurt on the job after feeling a pop in his back when lifting something.  He reported that workers' compensation denied imaging, but alleged he later found multiple ruptured discs in the spinal cord.  For treatment, he indicated that he engaged in ablation and injection therapy.  After he hurt his back, he said that migraines started, occurring up to three to five days per week.  He also reported that migraines were part of his seizure disorder.  He testified that he takes medications to manage pain, sleep, migraines, vertigo, seizures, and tremors (Exhibits 18E, 23E).  He described nausea and occasional stomach pain from his medications.  He also reported that he required shoulder surgeries in 2016 and 2017.

Concerning his seizures, the claimant said that episodes started in 2014 or 2015, and he did not know what they were.  He said he kept working because they were not as bad as they are now.  He stated that his first major seizure was about seven years ago, in 2016.  In a report from May 2019, the claimant wrote that his seizures occurred randomly, and he had two in the previous month; he estimated that he could not resume normal activities after a seizure for 30 minutes to four hours (Exhibit 7E).  He stated that he drove, but he had restrictions, including an additional driver in the car when driving.  He said it has been a while since he last drove by himself.

On a typical day, the claimant testified that he did not do much.  He said he put the chickens up at night (i.e., got them into the cage and latched it), built Lego blocks with his daughter, and prepared frozen meals.  He stated that he vacuumed 10 to 12 minutes at a time and took out the garbage if it was not too heavy.  He testified that he had to sit and rest after these chores.  He estimated that he could lift no more than 20 pounds.  He indicated that he might watch television for a couple of hours.  He said he did not read because of dyslexia, and he noted that seizure activity made his dyslexia worse.  He said he did not need to use a cane or other assistive device to walk around.

On his behalf, the claimant's wife completed a third-party function report (Exhibit 5E).  She reported similarly, indicating that he significantly limited

his household chores and driving.  She noted that every day for him varied, depending on how he felt when he woke up.

(AR at 25–26.)

The ALJ concluded that Plaintiff's "and his spouse's third-party statements concerning the intensity, persistence, and limiting effects of these symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record."  (Id. at 28.)  The ALJ then discounted Plaintiff's subjective symptom testimony citing the following two reasons: (1) objective medical evidence in the record, including Plaintiff's reports, demonstrated significant improvement of his symptoms with treatment; and (2) Plaintiff's reports of his daily activities conflicted with his symptom allegations.  (See id. at 28–29.)

### a.    Improvement of symptoms with treatment

The ALJ discounted Plaintiff's subjective symptom testimony because the record demonstrated improvement with treatment across a variety of symptoms.  (See id. at 28–29 (citing id. at 569, 576, 621, 632, 646, 703, 1231, 1477, 1769, 1828, 2445, 2563–64, 3041, 3698, 4125, 4168–72).)  In assessing a claimant's subjective symptoms, an ALJ may properly consider the "type, dosage, effectiveness, and side effects of any medication taken to alleviate pain," as well as "[t]reatment, other than medication" the claimant receives or has received to relieve "pain or other symptoms."  See 20 C.F.R. § 404.1529(c)(3)(iv)–(v); see also Wellington v. Berryhill, 878 F.3d 867, 876 (9th Cir. 2017) (stating that "evidence of medical treatment successfully relieving symptoms can undermine a claim of disability"); Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits.").

In his written decision, the ALJ initially addressed Plaintiff's shoulder surgeries. (Id. at 29.)  The ALJ cited progress notes from Dr. William Frase Luetzow, an orthopedic surgeon, who documented on December 17, 2018, Plaintiff's report of "pain at [the] rotator interval, though this has improved some over time," as evidence of the

effectiveness of Plaintiff's shoulder surgeries in managing his pain.  (AR at 621.)  At a

subsequent phone visit on May 23, 2019, Dr. Luetzow's progress notes indicated that

Plaintiff reported that "[r]ight shoulder pain [was] manageable."  (Id. at 1231.)  The ALJ

also referenced Dr. Luetzow's notes from a visit on June 21, 2022, in which Dr. Luetzow

described Plaintiff as experiencing "some pain," but indicated that he was neither injured

nor eligible for workman's compensation.  (Id. at 4169.)

Next, the ALJ addressed the efficacy of RFT in reducing Plaintiff's back and

shoulder pain from 2017–2022.  (Id. at 29.)  Specifically, the ALJ cited notes from Stuart

Thomas Tee, M.D., a physical medicine and rehabilitation specialist, who noted on

December 5, 2017, that the RFT procedure "helped."  (Id. at 576, 703.)  The ALJ also

referenced notes from Rami Hachwi, M.D., a neurologist, who stated on February 26,

2019, that RFT resulted in "improvement of symptoms."  (Id. at 589.)  Additionally, the

ALJ cited records from David Khoa Anh Bui, M.D., an anesthesiologist and pain

management specialist, documenting Plaintiff's report of "good relief" from RFT on

April 25, 2019.  (See id. at 29, 569.)  The ALJ further cited a report from Jaianand Singh

Sethee, M.D., an anesthesiologist, who wrote on June 11, 2020, that Plaintiff disclosed

"[s]ignificant pain relief and improvement in functional status on the right side status post

cervical radiofrequency ablation" (id. at 1477) and a report from Derek Daniel Kwan,

M.D., an anesthesiologist and pain management specialist, who documented on July 31,

2020, that Plaintiff had a "good result from [RFT] but it seem[ed] to have helped his left

side more."  (Id. at 1828.)  Finally, the ALJ cited notes from Brandon Morgan McLellan,

M.D. who stated on February 11, 2022, that the RFT Plaintiff was receiving was

"helping."  (Id. at 3041.)

Finally, the ALJ addressed Plaintiff's migraine headaches.  The ALJ cited records

from neurology specialists Gretchen E. Schlosser Covell, M.D., and Cam Thuy Quang

Tran, M.D., as well as Shreya Parikh Chandra, M.D., an internal medicine specialist,

which demonstrated a general trend of improvement in Plaintiff's migraine symptoms

over time.  (See id. at 29 (citing id. at 646, 1769, 2445, 3698, 4125).)  These records

24cv1978-LR

1    included Dr. Schlosser Covell's notes from an assessment on June 28, 2019, at which

2    Plaintiff reported headache symptoms "twice a week." (Id. at 646.)  At a follow-up

3    appointment on June 22, 2020, Dr. Schlosser Covell reported that Plaintiff's migraines

4    were "down to one a month, but can last over a day and be severe." (Id. at 1769.)  Dr.

5    Schlosser Covell documented that Plaintiff experienced worsening symptoms on May 3,

6    2021, and adjusted Plaintiff's medication regiment. (Id. at 2445.)  Dr. Chandra's notes

7    from an appointment on May 17, 2022, documented that Plaintiff was experiencing two

8    migraines per month. (Id. at 4125.)  In notes from an appointment on November 17,

9    2022, Dr. Tran recorded that Plaintiff's "[s]eizures [were] controlled," but he "ha[d]

10   episodes of derealization and dizziness," which could be auras or migraines. (Id. at

11   3698.)

12          Accordingly, the ALJ identified specific statements Plaintiff made regarding his

13   symptoms that the ALJ discounted and cited voluminous medical records documenting

14   Plaintiff's reports of improvement of his symptoms with treatment. (See id. at 25–29.)

15   The Court therefore finds that the ALJ provided specific, clear, and convincing reason,

16   supported by substantial evidence in the record, to discount Plaintiff's testimony. See

17   Guthrie v. Kijakazi, No. 21-36023, 2022 WL 15761380, at *1 (9th Cir. Oct. 28, 2022)

18   (finding that the ALJ reasonably relied on evidence that treatment effectively controlled

19   the claimant's symptoms to discount her testimony); Bowen v. Kijakazi, No. 21-35600,

20   2022 WL 2610242, at *1 (9th Cir. July 8, 2022) (concluding that the ALJ properly

21   discounted a claimant's testimony about her limitations and symptoms where the

22   claimant told her medical care providers that she was "[d]oing extremely well" and had

23   "no complaints" after her surgery).

24          **b.    Plaintiff's daily activities**

25          Additionally, the ALJ determined that Plaintiff's testimony about his daily

26   activities was inconsistent with his alleged functional limitations. (See AR at 29.)

27   Plaintiff testified during his administrative hearing that he was unable to engage in

28   activities beyond "building Legos" with his daughter, did "nothing" during the day, and

did not go for walks around the neighborhood.  (Id. at 68.)  Plaintiff further testified that he was unable to go hiking because of his lower back.  (Id. at 71.)  To discount these statements, the ALJ cited the function reports submitted by Plaintiff and his wife, indicating that Plaintiff had "no difficulties with lifting, bending, standing, reaching, walking, or sitting," and had the "capacity to lift 20 pounds, help around the house and chicken coop, shop with his wife, manage his finances, and prepare food for himself." (Id. at 29 (citing id. at 435, 446, 3619).)  The ALJ further referenced evidence from the record showing that Plaintiff had previously reported "completing a home project for his daughter, hiking, and doing yardwork."  (Id. at 29 (citing id. at 1233, 1363, 1541, 3619).) Based on this evidence, the ALJ concluded that, although Plaintiff's "symptoms required significant functional limitations, and he could no longer perform previous work at the medium and heavy exertional levels," Plaintiff's functional capacities were not as severely limited as Plaintiff alleged.  (Id. at 29.)

An ALJ may properly consider the claimant's daily activities in evaluating testimony regarding subjective symptoms.  See 20 C.F.R. § 404.1529(c)(3)(i).  There are "two grounds for using daily activities to form the basis of an adverse credibility determination": an ALJ may find that daily activities either (1) contradict the claimant's other testimony, or (2) meet the threshold for transferable work skills.  Orn v. Astrue, 495 F.3d 625, 639 (9th Cir. 2007); see also Steele v. Berryhill, Case No.: 3:17-cv-01923-LAB (RNB), 2018 WL 2718033, at *3 (S.D. Cal. June 6, 2018) (same).  Here, the ALJ properly relied on the first ground.  The ALJ's conclusion that Plaintiff's daily activities contradicted his testimony was rational and the Court must defer to this interpretation. See Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1198 (9th Cir. 2004) (quoting Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995)) ("When the evidence before the ALJ is subject to more than one rational interpretation, [the Court] must defer to the ALJ's conclusion."); Ahearn, 988 F.3d at 1115–16 (same).

Based on the record, the ALJ rationally concluded that Plaintiff's testimony regarding his daily activities contradicted Plaintiff's testimony regarding his level of

24cv1978-LR

functioning.  See Thomas v. Barnhardt, 278 F.3d 947, 958–59 (9th Cir. 2002) (stating that an ALJ may properly rely on inconsistencies between a claimant's testimony and the claimant's daily activities); see also Scolari v. Kijakazi, Case No.: 21-cv-1250-BLM, 2022 WL 6785752, at *4–5 (S.D. Cal. Oct. 11, 2022) (finding that substantial evidence supported the ALJ's determination that a plaintiff's daily activities were not consistent with her subjective testimony and claims, which was a clear and convincing reason to discount the plaintiff's subjective testimony and claims).  The Court therefore finds that Plaintiff's daily activities provided an additional clear and convincing reason, supported by substantial evidence in the record, to discount Plaintiff's subjective symptom testimony.

### 6.    Conclusion

Substantial evidence in the record supported the ALJ's decision to discount Plaintiff's subjective symptom testimony.  The ALJ properly relied on evidence in the record demonstrating improvement of Plaintiff's symptoms with treatment.  See, e.g., Stearns v. O'Malley, No. 23-3875, 2024 WL 4814564, at *1 (9th Cir. Nov. 18, 2024) ("By identifying [claimant's] improvements with conservative treatment along with contradictions between [the claimant's] testimony and the medical record, the ALJ provided sufficient reasons to reject that testimony.").  The ALJ also properly identified a conflict between Plaintiff's testimony concerning his functional capacity and his reports of daily activities.  See, e.g., Mahnaz M. v. Kijakazi, Case No.: 22-cv-1729-BGS, 2024 WL 21794, at *6 (S.D. Cal. Jan. 2, 2024) (upholding an ALJ's decision to discount a plaintiff's subjective symptom testimony where the ALJ "could reasonably conclude" that the plaintiff's daily activities contradicted plaintiff's other testimony).  The ALJ therefore provided clear and convincing reasons, supported by substantial evidence, to discount Plaintiff's subjective symptom testimony.

/ / /

/ / /

/ / /

1

## VII.   CONCLUSION AND ORDER

For the reasons set forth above, the Commissioner's decision is **AFFIRMED.**
This Order concludes the litigation in this matter.

**IT IS SO ORDERED.**

Dated:  August 22, 2025

_____
Honorable Lupe Rodriguez, Jr.
United States Magistrate Judge

24cv1978-LR